# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 25, 2026

Lyle W. Cayce
Clerk

———————

No. 25-30325

———————

Weston Merriott,

*Plaintiff—Appellant*,

*versus*

City of Bossier City; Jeffrey Free, *In his official & individual capacities*; David A. Montgomery, *In his official & individual capacities*; Jeffery Darby; Charles Jacobs, *in his official capacity*,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:23-CV-1421

———————————————————————

Before Clement, Douglas, and Ramirez, *Circuit Judges*.

Irma Carrillo Ramirez, *Circuit Judge*:

Weston Merriott challenges the dismissal of his complaint, in which he alleges that a policy passed by the City Council of Bossier City, Louisiana, to regulate speech at its meetings violates the First Amendment as well as Louisiana law. We AFFIRM in part and REVERSE in part.

No. 25-30325

I

A

Merriott is an online journalist who resides in Bossier Parish, Louisiana. In 2023, he "began following a community movement petitioning for term limits for" Bossier City's elected officials. Because the petition was "on the agenda for discussion," Merriott attended a City Council meeting on July 18, 2023. At the start of the meeting, the City Clerk read the following provision from the "rules of 'Decorum: Members of the Public Addressing the Council'":

> Council in accordance with Louisiana Open Meetings Laws and the adopted Bossier City Council meeting rules resolution. The City Council asks for order and decorum at our meetings. Please silence your cell phones. Anyone wishing to address the Council on any agenda item may approach and state their name and address for the record and shall be permitted three minutes to make their comments on the particular item that's up for discussion, with up to four speakers per side. All other audience members are asked to please observe the meeting quietly and if there is a need for audience members to hold a conversation or take a phone call you're asked to please step out of the meeting. City Council appointed Sergeant at Arms have been instructed to maintain decorum and ask anyone in violation to step out of the meeting in [] order to maintain orderly conduct of the meeting.

During the public comment period at the meeting, Merriott spoke about "the importance of following the will of the people and not delaying the implementation of the term limit[s] petition."

The term limits petition was on the agenda for a City Council meeting on August 1, 2023. Merriott attended and "criticized the decision of some councilmembers to delay action on the petition by seeking outside counsel"

2

and "questioned the impartiality of the outside counsel, noting that outside counsel" had previously represented Councilmember David Montgomery in a deposition "years prior." Montgomery and Councilmember Jeffrey Free "interrupted" Merriott, and Free "instructed" Merriott to "stay on topic." Montgomery "requested that [City Attorney Charles] Jacobs respond" to the comments, and the City Attorney said that Merriott's comments were "absolutely false."

On August 15, 2023, the City Council convened again. The City Clerk started the meeting as usual but read aloud the following: "Any person making ***personal, impertinent or slanderous remarks*** or who ***shall become boisterous*** while addressing the Council shall be forthwith, by the President Pro-tem, ***barred from further audience before the Council unless permission to continue by [sic] granted by a majority vote of the Council***" (the "Policy"). The City Clerk continued:

> All remarks shall be addressed to the Council as a body and not to any member thereof. No questions shall be asked a [sic] Council person or the mayor except through the meeting chair.
>
> All other audience members are asked to please observe the meeting quietly. City Council appointed Sergeant at Arms have been instructed to maintain decorum and ask anyone in violation to step out of the meeting.

Merriott again "criticiz[ed] the Council for failing to listen to the Mayor and the citizens." Free and Councilmember Jeffrey Darby "interrupted" him, and Free "instructed [Merriott] to stay on topic and to only ask questions." Darby "instructed the [C]ity [C]lerk to read their procedures" again to Merriott, and she complied.

On August 20, 2023, Merriott "sent a letter" to the City Council, the City Attorney, and the Mayor, "requesting that the Council respect [Merriott's] First Amendment Rights and refrain from interrupting him."

No. 25-30325

The agenda for a City Council meeting on September 5, 2023, included an item to "[a]dopt a [r]esolution authorizing the City Attorney to take legal action to determine the validity of the certification of the petition of the Bossier Term Limits Coalition." Merriott attended and "questioned why it was necessary . . . to determine the validity of the petition when [the City Council] already had [an] opinion from private counsel." He "also raised concerns about the impartiality of the outside counsel" who had previously represented Montgomery. Montgomery "interrupted" and asked Free to have Merriott "removed." Merriott "asked that . . . Montgomery let him finish." Montgomery claimed that Merriott's statement "had nothing to do with the agenda item" and called again for Merriott's "removal." Free allowed Merriott to "conclude[] his remarks" but "instructed [him] to stick to the agenda and to not make any accusations against councilmembers."[1]

"[A] secret meeting of some councilmembers occurred directly after the September 5 City Council meeting." "[A] local news outlet" released an audio recording of the meeting, which captured Darby and Montgomery "speak[ing] about changing the rules of public comment to limit comment to the beginning of the meeting." "Darby then asked [the City Clerk] to draft new rules that would eliminate public comment at each agenda item." "Darby and Montgomery counted if they would have enough members to make the resolution in . . . Free's absence." "Montgomery asked: 'Jeffrey Free won't be here, so is [four] to [two] enough?'" The City Clerk "answered yes." After the audio recording was released, the City Attorney "attempted to silence the City Council and employees" by "threaten[ing] to call the FBI to bring wiretapping charges against the person who released the

_____

[1] The September 5 meeting minutes stated that Merriott "became disruptive in his remarks." Merriott "objected" to this characterization at the next meeting, but the City Council unanimously voted to approve the minutes without revision.

audio." Three days later, on September 8, the City Attorney emailed the City Council, stating "that he had begun an internal investigation related to the events occurring in the [C]ity [C]ouncil offices after the Council meeting." The City Attorney "instructed that there should not be any discussion about the events without including himself or the [A]ssistant [C]ity [A]ttorney."

Meanwhile, Merriott filed "an open meetings complaint with the Louisiana Attorney General concerning his treatment by the City Council and the Council's subsequent closed meeting." The City Attorney responded to the Louisiana Attorney General in a letter "confirm[ing]" that Montgomery "threatened" Merriott "with removal" at the September 5 meeting "because [Merriott's] comments allegedly violated the City Council rules." The letter also confirmed that Montgomery, Maggio, Darby, and Willams "met directly after the Council meeting" to "chang[e] the public comment rules to limit public comments at meetings in reaction to Merriott's comments."

B

Merriott sued Bossier City, the City Attorney in his official capacity, and Councilmembers Free, Montgomery, and Darby in their individual and official capacities, under 42 U.S.C. § 1983 and the Louisiana Open Meetings Law. Merriott alleges: (1) the Policy is facially overbroad under the First Amendment; (2) the Policy is facially void for vagueness under the Fourteenth Amendment; (3) the Policy is facially an impermissible viewpoint- and content-based restriction under the First Amendment; (4) the Policy violates the First Amendment as applied to him under *Monell*; (5) the City Council violated the First Amendment by retaliating against him

No. 25-30325

under *Monell*; (6) Free, Montgomery, and Darby violated the Louisiana Open Meetings Law; and (7) Appellees violated the state Constitution.[2]

Appellees moved to dismiss Merriott's complaint under Rule 12(b)(6). The district court granted the motion and ultimately dismissed all of Merriott's claims.[3]

## II

This appeal arises from a Rule 12(b)(6) dismissal, which the court reviews de novo. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). The same standard applies to the constitutionality of an enactment. *Garner v. U.S. Dep't of Lab.*, 221 F.3d 822, 825 (5th Cir. 2000). "To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states 'a claim to relief that is plausible on its face.'" *Brown v. Taylor*, 911 F.3d 235, 242 (5th Cir. 2018) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a complaint, "we take all factual allegations as true and construe the facts in

---

[2] Merriott also claimed that the Policy's provisions limiting the number of speakers on a topic and banning violators from all future meetings were unconstitutional, and that the City Attorney violated the First Amendment by issuing a "Gag Order" silencing conversation about the "secret meeting" on September 5.

[3] Near the end of the proceedings in the district court, the City Council repealed and reenacted the Policy. The new version was the same, except that it barred an individual who violated the Policy "during that meeting" without exception. Merriott's live complaint challenged the repealed version of the Policy, which was enforced against him. Because the parties do not dispute that both versions are substantively the same for purposes of this case, the parties appear to agree that this court should review the current version. *See Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 636 (5th Cir. 2023).

the light most favorable to the plaintiff." *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017).

## III

Merriott first argues that he plausibly alleged that the policy is facially overbroad.

"First Amendment overbreadth challenges 'are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the policy from chilling the First Amendment rights of other parties not before the court.'" *Lowery v. Mills*, 157 F.4th 729, 745 (5th Cir. 2025) (citation modified) (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984)). Unlike typical facial challenges, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 472–73 (2010)). "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (first citing *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988); and then citing *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800–01 (1984)).

## A

Merriott argues that the district court erred by concluding that, under *United States v. Hicks*, 980 F.2d 963 (5th Cir. 1992), his overbreadth claim was inappropriate. Because an overbreadth challenge is "essen[tially] . . . an exception to the usual requirements of standing[,]" *Int'l Soc. for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 499

(5th Cir. 1989),[4] and *Hicks* ensures an overbreadth challenge is nevertheless "appropriate" to entertain as a threshold matter, we address this issue first, *Hicks*, 980 F.2d at 969.

In *Hicks,* this court held that "an overbreadth challenge is not appropriate if the [F]irst [A]mendment rights asserted by a party attacking a statute are essentially coterminous with the expressive rights of third parties." *Id.* at 969 (first citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985); and then citing *Vincent*, 466 U.S. at 801–02). This holding rested on the principle articulated by the Supreme Court in *Brockett* that an overbreadth challenge is inappropriate if the challengers only "desire to engage in protected speech that the overbroad statute purports to punish"; an as-applied challenge is instead the proper vehicle for the claim. 472 U.S. at 504; *see also Vincent*, 466 U.S. at 801–02 (rejecting overbreadth challenge as "inappropriate" where there was "nothing in the record to indicate that the [challenged enactment] w[ould] have any different impact on any third parties' interests in free speech than it ha[d] on the" plaintiffs).

Consistent with *Brockett* and its progeny, this court will not entertain an overbreadth challenge where the challenger alleges that the enactment is overbroad simply because it reaches their own conduct, just as it would another. *Hicks*, 980 F.2d at 969 (dismissing overbreadth challenge because challengers did not argue that the statute "chille[d] expression other than" profanity, in which they engaged and for which they were punished). For example, it has rejected overbreadth challenges where a plaintiff "fails to allege any additional conduct that would be unconstitutionally prohibited" by the challenged enactment. *Longoria Next Friend of M.L. v. San Benito*

---

[4] Still, "Article III standing retains rigor" in overbreadth cases and it undisputedly exists here. *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010).

*Indep. Consol. Sch. Dist.*, 942 F.3d 258, 270 (5th Cir. 2019). Conversely, it has permitted overbreadth challenges where a plaintiff has "pointed to" multiple "potential applications" of the challenged law that are "distinct from their own situation." *Seals v. McBee*, 898 F.3d 587, 599 (5th Cir. 2018) (approving of overbreadth challenge because "plaintiffs raise[d] numerous hypotheticals that [we]re not coterminous with the conduct for which they were arrested").

Here, as in *Seals*, Merriott has "pointed to" multiple "potential," "hypothetical[]" "applications" of the Policy that are "distinct from [his] own situation." *See id.* The Policy prohibits "personal[,]" "impertinent[,]" and "slanderous" speech, as well as "becom[ing] boisterous." Merriott pleaded that, by Appellees' own admission in a letter to the Louisiana Attorney General, he was interrupted because his remarks were "defamatory" according to the City Council. But the Policy forbids much more than what Appellees interrupted Merriott for doing. Like *Seals*, there is a seemingly endless list of "realistic, no[n][-]fanciful," *see Hansen*, 599 U.S. at 770, potential applications of the Policy to scenarios unlike Merriott's, *see Seals*, 898 F.3d at 599. And the Policy, like the law in *Seals*, concerns "core" First Amendment freedoms. *See id.* at 600.

Because Merriott has raised multiple "potential applications" of the Policy that are "distinct from [his] own situation," the rights he asserts are not "essentially coterminous with" third parties', and we may proceed to the merits of his overbreadth challenge. *See id.* at 599; *see also Hicks*, 980 F.2d at 969.

B

To evaluate Merriott's overbreadth challenge, we first must "construe the challenged statute." *See Seals*, 898 F.3d at 593 (quoting *Stevens*, 559 U.S. at 474). "'We start, of course, with the [Policy's] text,' and

No. 25-30325

proceed from the understanding that 'unless otherwise defined, . . . terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (citation modified) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)).[5] After construing the Policy, our next step is to decide whether the Policy "encompasses a substantial number of unconstitutional applications 'judged in relation to [its] plainly legitimate sweep.'" *Seals*, 898 F.3d at 593 (quoting *Stevens*, 559 U.S. at 473).

Here, because the Policy does not define the terms "personal, impertinent or slanderous remarks" or "becom[ing] boisterous," we interpret each by its ordinary meaning. *See Stevens*, 559 U.S. at 474 (noting the "ordinary meaning" of statutory terms is "properly applie[d]" when construing a statute to assess a First Amendment overbreadth challenge); *United States v. Perez*, 43 F.4th 437, 442, 445 (5th Cir. 2022) (applying ordinary meaning in overbreadth case). We then consider its scope.

1

"Personal" is ordinarily understood to mean "of, relating to, or affecting a particular person."[6] And a "remark" is ordinarily understood to mean "the act of remarking," "an expression of opinion or judgment," or "mention of that which deserves attention or notice."[7] To "remark," means "to take notice of" or "to express as an observation or comment."[8]

---

[5] Generally, a court will defer to a city's interpretation of its own rule or ordinance, so long as it "does not conflict with the . . . text." *Zimmerman v. City of Austin*, 881 F.3d 378, 394 (5th Cir. 2018) (quoting *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013)). Here, Appellees have not suggested that an authoritative interpretation exists.

[6] *Personal*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/T4EA-68SX.

[7] *Remark*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/3PR2-24HC.

[8] *Id.*

Based on the ordinary meaning of "personal remarks," the Policy prohibits speakers from uttering an infinite number of protected, relevant statements or questions. For example, a speaker must refrain from: (1) using a councilmember's name for the record; (2) mentioning that a councilmember may have a personal stake in the outcome of a vote; (3) stating that a councilmember engaged in a corrupt act; (4) highlighting that a councilmember had recently been convicted of a crime; (5) claiming that a councilmember lied to the public; (6) suggesting that a councilmember had a conflict of interest; and (7) bringing to public attention that a councilmember had been sued—just to name a few. The Policy forbids a citizen from noting that a councilmember has—even questionably—done anything that may be relevant to the public. The possible applications are unquantifiable, especially when not harnessed by any limiting principle.

This court has not yet considered the constitutionality of a provision that bars "personal remarks," as did the Ninth Circuit did in *Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th Cir. 2013) (per curiam). *Acosta* involved a facial overbreadth challenge to an ordinance governing speech in city council meetings that stated, in relevant part:

> It *shall be unlawful* for any person while addressing the council at a council meeting to violate any of the following rules after being called to order and warned to desist from such conduct: No person shall make any *personal, impertinent, profane, insolent, or slanderous remarks.*

*Id.* at 811. In holding that the ordinance was facially overbroad, the Ninth Circuit noted that it captured "nothing more than bold criticism of City Council members," but it is a "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an

No. 25-30325

idea simply because society finds the idea itself offensive or disagreeable." *Id.* at 815–16 (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).[9] We agree.

### 2

"Impertinent" means "given to or characterized by insolent rudeness" or "not restrained within due or proper bounds especially of propriety or good taste."[10] With no limiting principle, this provision effectively allows the City Council to decide which comments are permissible at its whim. If a councilmember is offended by comments that the Council does "not have the citizenry's best interest in mind," or it is "breaking the law," or "not listening to the demands of its constituents," the Council could simply silence the speaker.

Although we have also not considered whether a prohibition on "impertinent . . . remarks" runs afoul of the Constitution, *Acosta* held that a verbatim enactment did. *Id.* at 811. Because the Policy is so unbounded and covers a substantial amount of core First Amendment activity in relation to its legitimate sweep, we agree.

### 3

As for the term "slanderous remarks," we held overbroad a portion of a city ordinance that forbade amplification of "slanderous" sound in *Reeves v. McConn,* 631 F.2d 377, 380 n.1, 387–88 (5th Cir. 1980). *Reeves* noted

---

[9] District courts have reached similar conclusions. *See Marshall v. Amuso*, 571 F. Supp. 3d 412, 425 (E.D. Pa. 2021) (holding a prohibition on "personally directed" speech in school district meeting likely overbroad); *Monroe v. Hou. Indep. Sch. Dist.*, 419 F. Supp. 3d 1000, 1007–09 (S.D. Tex. 2019) (holding a school-board-meeting policy against "name-calling" and "offensive or derogatory remarks" likely overbroad), *vacated in part on other grounds*, No. 19-cv-1991, 2021 WL 5830822 (S.D. Tex. Nov. 3, 2021).

[10] *Impertinent*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/CQ49-9ASX.

that, under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and its progeny, "certain forms of common-law defamation are . . . protected by the First Amendment, such as statements about public officials unless made with knowledge of the statement's falsity or reckless disregard for its accuracy." 631 F.2d at 387. Because the ordinance "ma[de] no attempt to distinguish the specific forms of slander that the city may constitutionally prohibit[,]" we concluded that the ordinance's "overbreadth exert[ed] a substantial chill upon speech that is close to the heart of the First Amendment, because it place[d] the speaker in doubt regarding what he [could] say . . . about public officials and public figures." *Id.* at 387–88.

Here, "slanderous" is used in the same way against the same backdrop of *Sullivan*'s progeny, and it creates the same "chill." *See id.* at 387. We reaffirm that, standing alone, this proscription is overbroad.

4

Ordinarily, "boisterous" means "noisily turbulent" or "rowdy."[11] The parties agree that, as used in the Policy, the term refers to both traditional speech and conduct. Under that expansive definition, banging one's hand on the podium, emphatic hand gestures, pointing, crying, clapping, or simply shifting one's tone could trigger application of the Policy, as could any remark deemed "rowdy" or inflammatory. Again, the potential applications are limitless.

Albeit in dicta, this court previously "question[ed] whether, standing alone and without context, a prohibition on 'boisterous' conduct would survive an overbreadth challenge" in *Roy v. City of Monroe*, 950 F.3d 245, 253 (5th Cir. 2020). Because the issue was not preserved in *Roy*, we did not

---

[11] *Boisterous*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/TK23-XKZM.

address the question. *Id.* at 251 n.1, 253. But in the context of this case, we hold that a standalone prohibition on "becom[ing] boisterous" is too broad to be constitutionally permissible.

This holding is guided by *Coates v. City of Cincinnati*, in which the Supreme Court struck down as facially overbroad a criminal ordinance prohibiting groups on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by." 402 U.S. 611, 611, 614 (1971). Noting that the ordinance covered a wide array of constitutionally protected conduct, the Court held the statute overbroad because its enforcement turned "entirely" on "whether or not a policeman [was] annoyed." *Id.* at 614. Here, the Policy's prohibition on becoming "boisterous" likewise turns "entirely" on "whether or not a [councilmember] is annoyed." *See id.* The doubt expressed in *Roy* applies with equal force here. *See Roy*, 950 F.3d at 253. Merriott has plausibly alleged that the Policy is overbroad. *See Coates*, 402 U.S. at 614.

\*　　\*　　\*

We conclude, in construing the Policy—bereft of definitions—that it contains no textual basis upon which we can fashion a narrowing construction. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute."). The parties do not advance one, and we are not free to create one. *See Serafine v. Branaman*, 810 F.3d 354, 369 (5th Cir. 2016) ("We decline to give [an overbroad enactment] an additional extra-textual limiting construction in a frantic attempt to rescue it."). Bossier City set the scope of its Policy, and it is nearly limitless.

We next conclude that the Policy "encompasses a substantial number of unconstitutional applications 'judged in relation to [its] plainly legitimate sweep[.]'" *See Seals*, 898 F.3d at 593 (quoting *Stevens*, 559 U.S. at 474). While a city may restrict speech in a limited public forum like Bossier City's

City Council chamber, it must do so reasonably in light of the purpose of its forum. *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010). An enactment's legitimate sweep may constitutionally encompass disturbances to regulate the manner of speech in the government's forum for the government's purpose, but it cannot do so in swaths so broad that nearly anything that could be uttered could fall within its reach. *See id.*; *Acosta*, 718 F.3d at 811; *Reeves*, 631 F.2d at 397–88. That is especially true where, as here, the purpose of the City Council meeting is to host debate. *Cf. Fairchild*, 597 F.3d at 759–60 (upholding speech policy in school board meetings in part because that limited public forum's purpose was "not for dialogue or decision-making" and was instead a "learning and routing mechanism"). This sort of debate is at the heart of the First Amendment tradition. *See Sullivan*, 376 U.S. at 270 (noting that this country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

Because there is "a realistic danger that the [Policy] itself will significantly compromise recognized First Amendment protections of parties not before the court," *see Vincent*, 466 U.S. at 801, and because the Policy's reach is so disproportionate to its legitimate sweep, *see Stevens*, 559 U.S. at 473, Merriott has plausibly alleged his facial overbreadth claim.

## IV

Merriott next contends he plausibly alleged that the Policy is void for vagueness because it fails to provide adequate notice of prohibited conduct and invites arbitrary, discriminatory enforcement. We agree.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of*

*Rockford*, 408 U.S. 104, 108 (1972). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (quoting *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 224–25 (5th Cir. 2009)).

A

"A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926)). When the challenged enactment "potentially restricts the right of freedom of speech, then the standard is more stringent." *Medlin v. Palmer*, 874 F.2d 1085, 1090 (5th Cir. 1989) (first citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499, (1982); and then citing *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)). Even under a "stringent" test, this court "will not hold [a law] unconstitutionally vague on its face if 'it is clear what the ordinance as a whole prohibits' or if the ordinance 'is surely valid in the vast majority of its intended applications.'" *Roy*, 950 F.3d at 252. (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).

1

Regarding "slanderous . . . remarks," this court already held that a threadbare prohibition on "slanderous" speech is void for vagueness. *Reeves*, 631 F.2d at 388. Here, the Policy's prohibition on "slanderous" speech is likewise threadbare.

2

As for the prohibitions on "personal" and "impertinent . . . remarks," this court has yet to address these precise terms in a vagueness challenge. But the Supreme Court held unconstitutionally vague similar language that criminalized "annoying . . . persons passing by" on sidewalks when done by groups of three or more persons. *Coates*, 402 U.S. at 611–12, 614. *Coates* held that the ordinance was "unconstitutionally vague because it subject[ed] the exercise of the right of assembly to an unas[c]ertainable standard," noting that what "annoys some people does not annoy others." *Id.* at 614. The ordinance depended entirely "upon whether or not a policeman [was] annoyed." *Id.*

Relying on *Coates*, we held vague language prohibiting intentional communication that "annoy[ed] or alarm[ed] the recipient." *See Kramer v. Price*, 712 F.2d 174, 176, 178 (5th Cir. 1983) (per curiam), *vacated on other grounds on reh'g*, 723 F.2d 1164 (5th Cir. 1984). While the court's reasoned panel opinion in *Kramer* was vacated after the challenged statute was amended, it is persuasive because it followed *Coates*. *Kramer* noted that "*Coates* recognized that a statute is unconstitutionally vague when the standard of conduct it specifies is dependent on each complainant's sensitivity." *Id.* at 178; *see also Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) (holding that a school-board policy that prohibited speech that was "irrelevant," "abusive," "offensive," "intolerant," or "otherwise inappropriate" was too vague to give reasonable notice because "[w]hat may be considered" speech of this sort "varie[d] from speaker to speaker, and listener to listener" so much that the terms were "irreparably clothed in subjectivity").

Appellees argue that the Policy is not unconstitutionally vague because the words are "commonly understood," as each word may be

No. 25-30325

defined by the dictionary. While this court has "resisted vagueness challenges when the challenged law is couched in 'commonly understood' language," *Roy*, 950 F.3d at 253, it has never held that a dictionary definition is conclusive evidence of constitutionality. In fact, in *Coates*, the Supreme Court reversed the Ohio Supreme Court's reliance on and acceptance of a dictionary definition as dispositive. 402 U.S. at 612–14. This court followed suit in *Kramer*. 712 F.2d at 177–78. The existence of a common dictionary definition does not automatically cure any constitutional defect. *See Coates*, 402 U.S. at 612–14.

Here, the terms "personal" and "impertinent"—which are undefined—fail to provide speakers with a "reasonable opportunity to know what conduct is prohibited." *See McCleland*, 63 F.4th at 1013. Both terms turn on a listener's "sensitivity" alone. *See Coates*, 402 U.S. at 613–14. And neither term "indicate[s] whose sensibilities must be offended." *See Kramer*, 712 F.2d at 178; *Coates*, 402 U.S. at 613–14; *Marshall*, 571 F. Supp. 3d at 424.

3

The term "boisterous" is vague for the same reasons. In *Roy*, this court considered the constitutionality of a city code's prohibition of:

> any act other than [constitutionally protected expression or assembly] in such a manner as to disturb or alarm the public, or make such a disturbance imminent, or to provoke another or other to retaliatory action or violence.

950 F.3d at 251 (alteration in original). Although the plaintiff only argued that the provision was vague because it permitted "arbitrary and discriminatory enforcement," this court also considered the notice question and further stated, "standing alone, it may be reasonable to suppose that" the prohibition "fail[ed] meaningfully to guide the police and thus pose[d] a substantial risk of arbitrary or discriminatory enforcement." *Id.* at 252–53. The court noted

18

that statutory "[v]agueness can be ameliorated by a state court's authoritative interpretations, if they provide sufficient clarity." *Id.* at 252 (quoting *Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 597 (5th Cir. 2010)). It also noted that the Louisiana Supreme Court had interpreted a prior version of the same ordinance and held that conduct is in "'a manner which would *foreseeably* disturb or alarm the public' only when that conduct 'is violent or boisterous in itself, or . . . provocative in the sense that it induces a foreseeable physical disturbance.'" *Id.* (quoting *State v. Jordan*, 369 So.2d 1347, 1350 (La. 1979)). Based on that case, *Roy* held that "boisterousness" is "familiar to 'common usage and everyday speech,'" *id.* at 253 (quoting *Doe I v. Landry*, 909 F.3d 99, 118 (5th Cir. 2018)), so the ordinance was not too vague to describe "what [it] 'as a whole prohibits,'" *id.* at 252 (quoting *Hill*, 530 U.S. at 733).

*Roy* is distinguishable. First, the ordinance in *Roy* did not use the term "boisterous." *See id.* at 251. Second, it contained critical context absent here—the challenged catch-all provision was part of a broader scheme that, "as a whole," forbade "disturbing the peace." *Id.* at 249, 252–53. Third, the ordinance could be interpreted against the backdrop of an authoritative opinion of the Louisiana Supreme Court. *Id.* at 253. In this Policy, the term "boisterous" is too vague to give reasonable notice of what is prohibited.

B

Merriott also argues that the Policy is too vague because it invites arbitrary, discriminatory enforcement. Again, we agree.

"To gauge 'arbitrary enforcement,' courts consider whether the [enactment] is liable to being 'stretched out of shape.'" *United States v. De Bruhl*, 118 F.4th 735, 745 (5th Cir. 2024) (quoting *Skilling v. United States*, 561 U.S. 358, 412 (2010)). This inquiry focuses on whether the enactment has workable definitions or "explicit standards." *See, e.g.*, *Roark & Hardee*

*LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008) (quoting *Grayned*, 408 U.S. at 108); *see also Hoffman Estates*, 455 U.S. at 498 ("[L]aws must provide explicit standards for those who apply them." (quoting *Grayned*, 408 U.S. at 108)). When an enactment is "plagued with . . . hopeless indeterminacy" or is "so standardless that it invites arbitrary enforcement," it is unconstitutionally vague. *City of El Cenizo v. Texas*, 890 F.3d 164, 190 (5th Cir. 2018) (citation modified) (quoting *Johnson v. United States*, 576 U.S. 591, 595, 598 (2015)).

Here, violations of the Policy turn only on the listener's discretion—precisely what *Coates* forbids. 402 U.S. at 613–14; *see also Kramer*, 712 F.2d at 178. As to the prohibition on "slanderous remarks," in addition to holding the term "slanderous" in a city ordinance overbroad, *Reeves* also held that it was unconstitutionally vague. 631 F.2d at 388. *Reeves* applies with equal force here. And absent any "explicit standards for those who apply" the Policy to safeguard against its arbitrary and discriminatory enforcement by the City Council, the Policy's other terms are likewise unconstitutionally vague. *See Grayned*, 408 U.S. at 108–09 ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."). In the First Amendment context, the lack of any guiding standards is particularly troubling because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," producing a chilling effect. *Id.* at 109 (citation modified).

V

Merriott also argues that he plausibly alleged that the Policy unconstitutionally discriminates based on content and viewpoint.

No. 25-30325

In a limited public forum, the government may restrict speech based on content if the restriction: (1) "does not discriminate against speech on the basis of viewpoint"; and (2) "is reasonable in light of the purpose served by the forum." *Fairchild*, 597 F.3d at 758 (quoting *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (per curiam)).[12] A law that discriminates based on content "regulate[s] speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Viewpoint discrimination is "a subset" and "an egregious form of content discrimination" that is presumptively unconstitutional. *Id.* at 829–31. A government "may reserve [a limited public] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983).

A

"Giving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017). "[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Id.* at 244 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)). Accordingly, *Matal* held that the Lanham Act's prohibition on federal registration of trademarks "which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute" constituted viewpoint discrimination forbidden by the First Amendment. *Id.*

---

[12] "The scope of . . . [F]irst [A]mendment rights depends on the nature of the forum to which [a plaintiff] seeks access." *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 376 (5th Cir. 1989). Here, the parties agree that Bossier City Council meetings constitute limited public forums. A limited public forum "provide[s] 'for public expression of particular kinds or by particular groups.'" *Fairchild*, 597 F.3d at 758 (quoting *Chiu*, 260 F.3d at 346).

at 227, 243–44 (quoting 15 U.S.C. § 1052(a)). In *Iancu v. Brunetti*, the Supreme Court followed *Matal* and invalidated a provision of the Lanham Act restricting the filing of "immoral or scandalous" matter because it "permit[ted] registration of marks that champion society's sense of rectitude and morality but not marks that denigrate those concepts." 588 U.S. 388, 390–94 (2019).

This court has not considered whether an enactment like the Policy here is permissible, but the Sixth Circuit did in *Ison v. Madison Local School District Board of Education*, 3 F.4th 887 (6th Cir. 2021). It held that a school board policy restricting "abusive, personally directed, and antagonistic speech" during board meetings constituted unconstitutional viewpoint discrimination. *Id.* at 891, 893–95. The Policy "contain[ed] no definitions," but summary judgment evidence showed that the school board understood "'abusive' to mean 'hostile to one's feelings or towards [sic] in your manner of speech'"; "'antagonistic' to mean 'to antagonize with hostility toward oneself or one's person'"; and "'personally directed' to mean 'either harassing or abusive statements directed at someone individually.'" *Id.* at 893 (citation modified). Relying on dictionary definitions, the Sixth Circuit agreed that "by definition, [the policy] prohibit[ed] speech opposing the [school] [b]oard." *Id.* at 893–94. The terms "plainly fit in the 'broad' scope of impermissible viewpoint discrimination because, like in *Matal* [and] *Iancu*, . . . they prohibit[ed] speech purely because it disparages or offends." *Id.* (quoting *Matal*, 582 U.S. at 243).

*Ison* is persuasive. Like the school board policy in *Ison*, the Policy here turns on the perception of the individual councilmembers. *See id.* Merriott has plausibly alleged that its prohibition against "personal[,]" "impertinent[,]" and "slanderous" speech constitutes unconstitutional viewpoint discrimination. *See Matal*, 582 U.S. at 243; *Iancu*, 588 U.S. at 390–94 ; *Ison*, 3 F.4th at 893–94. The prohibition on becoming "boisterous" is not

No. 25-30325

plausibly viewpoint based, however, because it is entirely viewpoint neutral. *See Fairchild*, 597 F.3d at 753, 758. Merriott raises no argument to the contrary.

B

Merriott also challenges the Policy as an unconstitutional content-based restriction. Because the Policy regulates viewpoint, it also regulates content. *See Rosenberger*, 515 U.S. at 828. The only question is whether it does so permissibly.

As noted, a government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. Because the City Council's chamber is a limited public forum, "there is no requirement of narrow tailoring" but "the [government] must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018); *see also Fairchild*, 597 F.3d at 758; *Chiu*, 260 F.3d at 346.

Because the Policy's prohibitions against "personal[,]" "impertinent[,]" and "slanderous" speech are viewpoint based, they are also content based to an impermissible degree and unreasonable. *See Rosenberger*, 515 U.S. at 829, 831 (viewpoint discrimination is "an egregious form of content discrimination" and is "a subset or particular instance of the more general phenomenon of content discrimination").[13] The prohibition on

_____

[13] Notably, in *Steinburg v. Chesterfield County Planning Commission*, 527 F.3d 377 (4th Cir. 2008), the Fourth Circuit upheld a facial challenge to a policy against "personal attacks" after concluding it was "content-neutral." *Id.* at 387. Here, the Policy prohibits personal *remarks*, which is a fatally broad, vague content-based restriction.

No. 25-30325

becoming "boisterous" is different because it does not facially discriminate based on content. Based on the type of forum, this portion of the Policy is reasonably designed to host decorous debate—a permissible purpose. *See Fairchild*, 597 F.3d at 753, 758.

## VI

Merriott next argues, under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), that he plausibly alleged that the Policy is unconstitutional as the City Council applied it to him. To state a *Monell* claim, a plaintiff "must plead facts that plausibly establish that '(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.'" *St. Maron Props., L.L.C. v. City of Houston*, 78 F.4th 754, 760 (5th Cir. 2023) (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018)). Appellees dispute only the second and third elements.

## A

Under *Monell*, there are three ways to establish an official policy: (1) "written policy statements, ordinances, or regulations"; (2) "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy"; or (3) "a single decision . . . when the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim." *Id.* Here, the parties agree that the policy created and promulgated by the City Council—the policymaker by state law—constitutes an official policy.[14]

––––––––––––––––––––––––––

[14] Before the district court, Merriott alternatively defended this prong by alleging a custom of violating his First Amendment rights at three City Council meetings over a course of three months. He makes no renewed, substantive argument regarding any custom on appeal, so he has not maintained that position. *See Canales v. Stephens*, 765 F.3d 551, 576

No. 25-30325

B

Despite the stipulated existence of an official policy, Appellees argue that Merriott failed to plausibly allege the existence of an official policymaker because "[n]o action of the City Council shall be valid or binding unless adopted by the affirmative vote of a majority of the City Council membership." BOSSIER CITY, LA., CITY CHARTER § 3.13(f) (2025). Because Merriott's alleged constitutional violations stem from the interruption by individual councilmembers, rather than the whole City Council after a vote, Appellees argue Merriott's claim fails.

Merriott's as-applied *Monell* claim is based on enforcement of the Policy, which Appellees admit is an official policy. Because the acts upon which Merriott's claims are based were made pursuant to that Policy, Merriott plausibly alleged this element.[15]

---

(5th Cir. 2014); *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 343 n.5 (5th Cir. 2022).

[15] Merriott alternatively argued before the district court that he plausibly alleged Free, Montgomery, and Darby are final policymakers. The district court rejected that argument because any act of the City Council must be by majority vote, and because Free, who was presiding over the council meeting as President Pro-tem, exercised discretion to enforce the policy, which is decision-making rather policymaking authority. "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "[D]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Bolton v. City of Dallas*, 541 F.3d 545, 549 (5th Cir. 2008) (per curiam). "There is a fine distinction between a policymaker and a decisionmaker." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010). The President Pro-tem's enforcement decisions are not final because they are always subject to appeal, which turns on the majority vote of the Council. Merriott failed to plausibly allege that any of the councilmembers were final policymakers. *See Bolton*, 541 F.3d at 549.

No. 25-30325

C

The final moving force element is satisfied by a "direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). "[W]hen a municipal policy itself violates federal law, such a policy necessarily constitutes the 'moving force.'" *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997)).

Under *Bishop*, Merriott's claim satisfies *Monell* because he has plausibly alleged that the Policy is unconstitutional. *See id.* Apart from *Bishop*, Merriott also alleged facts that speak precisely to a direct connection between the Policy and the violation. He cites the City Attorney's letter to the Assistant Attorney General of Louisiana, which stated that Merriott's comments at the September 5, 2023, meeting "violate[d] the Bossier City Council rules which prohibit 'any person making personal, impertinent or slanderous remarks.'" (footnote omitted). And Merriott pleaded that he was "threatened with removal" under the Policy. He has more than plausibly alleged a direct connection between the Policy and the threat of removal.[16]

VII

Next, Merriott argues that he plausibly alleged a claim for First Amendment retaliation.

---

[16] Appellees maintain that, because Merriott finished his remarks and was never removed, he cannot allege sufficient facts to satisfy this prong. But the question is not whether a government policy contemplates a particular deprivation; it is whether the policy was the moving force behind the deprivation. *See Piotrowski*, 237 F.3d at 580; *Monell*, 436 U.S. at 694 ("[I]t is when *execution of a government's policy* . . . inflicts the injury that the government as an entity is responsible under § 1983." (emphasis added)). Appellees concede that they acted under the Policy. And interruption is tantamount to removal—in either instance, the speaker's ability to speak is stymied.

No. 25-30325

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). To establish a claim, Merriott must have plausibly pleaded that: (1) he was "engaged in constitutionally protected activity"; (2) "the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) "the defendants' adverse actions were substantially motivated against [Merriott's] exercise of constitutionally protected conduct." *Id.* Appellees dispute only the second element and whether Merriott's retaliation claim is cognizable under *Monell*.

A

The second element of a retaliation claim "requires some showing that the plaintiff's exercise of free speech has been curtailed." *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017) (quoting *id.* at 259). "A required showing of actual injury does not necessarily mean that plaintiffs must cease criticizing the government officials altogether in order to have a claim for retaliation." *Id.* at 697 (quoting *Keenan*, 290 F.3d at 260) (noting that it found injury to plaintiffs who "'backed off from direct involvement in helping expose unlawful practices in the constable's office,' even though at least one plaintiff continued to investigate and file complaints"). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Id.* (quoting *Keenan*, 290 F.3d at 259).

Merriott pleaded that his "speech has been chilled in fact by . . . Darby, Montgomery, and Free's actions at the Council meetings." He alleged that he "must and does self-censor for fear of removal and/or retaliation against him for his fully protected speech." Taking that factual

allegation in the light most favorable to him as we must, *see Kelly*, 868 F.3d at 374, Merriott has plausibly alleged that he self-censors for fear of repercussion, which is a cognizable injury, *see McLin*, 866 F.3d at 696; *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 322 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (noting for purposes of standing that "[t]he chilling effect of allegedly vague regulations, coupled with a range of potential penalties for violating the regulations, was, as other courts have held, sufficient 'injury'" (footnote omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))).

## B

Appellees argue that Merriott's retaliation claim is implausible because the councilmembers responsible for the conduct of which he complains are not policymakers under *Monell*.

Merriott's retaliation claim is based on three instances in which councilmembers interrupted him at a City Council meeting, and Montgomery's and Darby's efforts to pass "a resolution to eliminate public comment on agenda items" in retaliation for Merriott's comments at the meetings. The three interruptions under the Policy suffice to state a claim, *see supra* VI.B. But because the City Council never passed a resolution eliminating the public comment period, and Merriott does not allege that Montgomery and Darby are official policymakers under *Monell* for purposes of that proposal, Merriott's argument based on this theory fails. *See supra* note 15.

## VIII

The final issue is whether Merriott plausibly alleged an Open Meetings Law ("OML") claim under LA. STAT. ANN. §§ 42:11–42:29

Under the OML, "[e]very meeting of any public body shall be open to the public unless closed pursuant to" certain exceptions not relevant to this appeal. *Id.* § 42:14(A). It is to be "construed liberally." *Id.* The OML permits anyone "who has been denied any right conferred by the provisions of [the OML] or who has reason to believe" that a violation has occurred to file a lawsuit to "void any action" taken in violation of the OML. *Id.* §§ 42:24, 42:25(C). Relief includes declaratory relief and civil penalties. *Id.* §§ 42:26, 42:28.

## A

The principal dispute underlying the plausibility of Merriott's OML claim is whether the "secret meeting" between various councilmembers constituted a "meeting" for purposes of the OML.

The OML defines three key terms. First, a "public body" means a "village, town, and city governing authorities . . . and any other state, parish, municipal, or special district boards, commissions, or authorities, and those of any political subdivision thereof, where such body possesses policy making, advisory, or administrative functions." *Id.* § 42:13(A)(3). Second, a "meeting" means: "the convening of a quorum of a public body to deliberate or act on a matter over which the public body has supervision, control, jurisdiction, or advisory power." *Id.* § 42:13(A)(2). "[T]he convening of a quorum of a public body by the public body or by another public official to receive information regarding a matter over which the public body has supervision, control, jurisdiction, or advisory power" also constitutes a "meeting." *Id.* Third, a "quorum" is "a simple majority of the total membership of a public body." *Id.* § 42:13(A)(4). The OML also contains a limiting principle: it "shall not apply to chance meetings or social gatherings of members of a public body at which there is no vote or other action taken, including formal or informal polling of the members." *Id.* § 42:13(B).

No. 25-30325

Against this backdrop, we conclude that Merriott adequately pleaded that a meeting occurred. Merriott alleged that four councilmembers attended the conference, which constitutes a quorum. *See* BOSSIER CITY, LA., CITY CHARTER § 3.01(a) (2025) (setting the Council's size at seven members); LA. STAT. ANN. § 42:13(A)(4). Merriott also pleaded that the quorum met to "speak about changing the rules of public comment to limit comment to the beginning of the meeting," a matter over which the City Council has "supervision, control, jurisdiction, or advisory power." *See* BOSSIER CITY, LA., CITY CHARTER § 3.07 (2025); LA. STAT. ANN. § 42:13(A)(2). That constitutes "deliberat[ion] . . . on a matter over which the public body" has power. *See* LA. STAT. ANN. § 42:13(A)(2).[17] And even if they did not deliberate, at a minimum, Merriott pleaded that the quorum convened to "to receive information" within the meaning of the OML regarding the potential to change the Policy. *See id.*

The OML's limiting principle—that it does not apply to "chance meetings or social gatherings . . . at which there is no vote or other action taken, including formal or informal polling of the members"—is not implicated here. *See id.* § 42:13(B). Merriott pleaded that this meeting was not a "chance" or "social" one because the meeting was for a single purpose: "to discuss changing the public comment rules." And while there was no formal "vote" at the conference, Merriott plausibly alleged that "formal or informal polling of the members" took place. *See id.* The OML does not define "polling," but the Louisiana Attorney General has, and we defer to Louisiana's definition of its own law. *See Zimmerman*, 881 F.3d at 394. The

---

[17] The term "deliberate" means "to think about or discuss issues and decisions carefully." *Deliberate*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/23NK-6FE9.

No. 25-30325

Louisiana Attorney General adopted Black's Law Dictionary's definition of the term "polling" in an advisory opinion.[18] The opinion states:

> The [OML] does not define a formal or informal poll; however, with the instruction in LA. C.C. art. 11 that the words of a law are given their generally prevailing meaning, we can presume that the legislature intended to convey in LA. R.S. 42:13(B) that the [OML] does not apply to chance meetings or social gatherings of a public body, provided *there is no survey of opinions or discussion of intended votes, whether such an inquiry is referred to as a poll or not.*

La. Atty. Gen. Op. No. 12-0177, 2012 WL 5473807, 5 (2012) (emphasis added).

Here, Merriott pleaded that, in a meeting with a quorum, Montgomery asked whether there would be enough councilmembers to pass the resolution and received an affirmative response. At minimum, the fair inference that must be drawn in Merriott's favor is that Montgomery counted four likely votes after "elicit[ing] votes, opinions, or preferences" of his colleagues, or by "sampling [their] opinions." *Id.*; *see Kelly*, 868 F.3d at 374. According to Merriott's complaint, there was some "survey of opinions." *See* La. Atty. Gen. Op. No. 12-0177, 2012 WL 5473807, 5 (2012).

---

[18] Black's Law Dictionary contains multiple definitions of "poll":

> "A sampling of opinions on a given topic, conducted randomly or obtained from a specified group."

> "The result of the counting of votes."

> "To ask how each member of (a group) individually voted."

> "To question (people) so as to elicit votes, opinions, or preferences."

*Poll*, BLACK'S LAW DICTIONARY (8th ed. 2004).

Because Merriott plausibly alleged a "meeting" took place, he plausibly alleged an OML claim against Montgomery and Darby for attending that meeting.[19] Because the OML only contemplates penalties for those who "participate[] in" a meeting, however, and Merriott did not allege that Free attended the meeting at all, the OML claim against him should be dismissed. *See* LA. STAT. ANN. § 42:28.[20]

B

Appellees alternatively argue that dismissal is warranted because any violation of the OML was merely "technical."

The OML confers the right of open meetings, with notice and comment, and permits private plaintiffs to sue to enforce those rights. *See id.* §§ 42:14, 42:25. Hosting a "secret" meeting is far from technical—it flaunts the very thing the OML seeks to prevent.

Appellees rely on two cases in support of their "technical" violation argument, but both cases turned on the plaintiff's notice and presence at meetings. *See Rushing v. Se. La. Univ.*, 2022-0032, 2022 WL 4286824, *7 (La. App. 1 Cir. 9/16/22) (holding that any violation was "mere[ly] technical" and the plaintiff "was not denied any rights" because "he was aware of the meeting and was personally present at the meeting"), *writ denied*, 355 So.3d 618 (La. 2/14/23); *Daigre v. Terrebonne Ass'n for Retarded*

---

[19] Appellees argue that no meeting occurred under *Brown v. East Baton Rouge Parish School Board*, 405 So.2d 1148 (La. Ct. App. 1981). But *Brown* involved "executive sessions," which are not at issue here, and "the parties stipulated" that the conferences at issue "f[e]ll within the meaning of the term 'meeting' as defined in and covered by" the OML. *Id.* at 1151.

[20] Merriott also alleged that the Policy itself violates the OML; the district court dismissed this claim as unsupported by the statute. Merriott has failed to maintain that claim. *See Roe*, 53 F.4th at 343 n.5.

*Citizens*, 543 So.2d 1108, 1109–10 (La. Ct. App.) (denying relief for "technical violations of" the OML where the plaintiff had "actual notice of the meeting, and he and his lawyer were present[,]" although no OML-compliant notice of the meeting was given), *writ denied*, 548 So.2d 333 (La. 1989).[21] But here, Merriott had no notice and was not present.

Because Merriott's claim is more than "mere[ly] technical" and strikes at the heart of the OML, it is plausible.

## C

The final question is whether Merriott's claim for civil penalties is cognizable.

Under the OML, "[a]ny member of a public body who knowingly and wil[l]fully participates in a meeting conducted in violation [of the OML] shall be subject to a civil penalty . . . ." LA. STAT. ANN. § 42:28.

Merriott seeks two forms of relief under the OML: (1) declaratory relief stating that the individual defendants violated the OML; and (2) civil penalties against them. But nowhere does Merriott allege that they acted knowingly and willfully. Merriott effectively concedes this point by failing to respond to it in his reply brief. *See Duncan v. Wal-Mart La., L.L.C.*, 863 F.3d 406, 408 n.2 (5th Cir. 2017) (stating that failing to address appellees' responsive arguments is tantamount to abandonment). His claim for civil penalties must be dismissed. *See* LA. STAT. ANN. § 42:28.

---

[21] Appellees also cite *Pittman v. Washington Parish Reservoir District of State*, 2005-2278, 2006 WL 3734644 (La. App. 1 Cir. 12/20/06), but it found no OML violation at all. *See id.* at *3–4.

No. 25-30325

## IX

The judgment of the district court is AFFIRMED in part and REVERSED in part. The district court's dismissal of Merriott's content- and viewpoint-based discrimination claims based on the prohibition on "becom[ing] boisterous," his Open Meetings Law claim against Councilmember Free, and his Open Meetings Law claim for civil penalties, are AFFIRMED. The remainder of the judgment is REVERSED, and the case is remanded for proceedings consistent with this opinion.